ALFRED GARDNER & others *vs.* MASSACHUSETTS TURNPIKE AUTHORITY & others.

Suffolk.    May 8, 1964. — June 2, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Massachusetts Crime Commission. Special Commission. Massachusetts Turnpike Authority. Witness,* Compelling giving of testimony, Summons. *Constitutional Law,* Separation of powers, General Court, Who may question constitutionality. *General Court.*

Gardner *v.* Massachusetts Turnpike Authority.

The power of certain courts under Res. 1962, c. 146, to enforce summonses to witnesses issued by the Massachusetts Crime Commission includes enforcement of a summons to produce books and papers. [556]

The Massachusetts Crime Commission created by Res. 1962, c. 146, has power to investigate the doings of the Massachusetts Turnpike Authority. [556]

The circumstances, that the Massachusetts Crime Commission created by Res. 1962, c. 146, submitted to law enforcement officers evidence of crimes incidentally developed by its investigations, and that its general counsel was appointed a special Assistant Attorney General and participated in presenting evidence of that nature to grand juries, did not change the commission from an investigatory arm of the Legislature to an agency for law enforcement and prosecution of crime in violation of art. 30 of the Declaration of Rights of the Massachusetts Constitution, nor invalidate all its investigatory work, nor entitle persons summoned before it as witnesses in a particular investigation to resist the summonses. [556–559]

Persons summoned as witnesses in an investigation by the Massachusetts Crime Commission created by Res. 1962, c. 146, had no standing to question the constitutional validity of criminal proceedings against others resulting from evidence of crime developed by the commission's investigations. [559]

The provisions of Res. 1962, c. 146, relating to issuance of summonses by the Massachusetts Crime Commission and enforcement thereof by certain courts do not limit the broad investigatory authority of the commission under other provisions of the resolve to inquiry into particular transactions as in trials of criminal cases, nor preclude use of the commission's summoning power in connection with a general inquiry within the scope of its broad investigatory authority. [559–560]

Summonses issued by the Massachusetts Crime Commission created by Res. 1962, c. 146, each requiring attendance of an officer or employee of the Massachusetts Turnpike Authority before the commission to give evidence "relating to the existence and extent of corrupt practices in government at state and local levels in the Commonwealth and in particular to" either "the operation of the . . . Authority" or the filing and storage of records in and the operation of a particular office of the Authority, were shown by the record to have been issued to secure information about a "matter being investigated by . . . [the commission] pursuant to the provisions of" the resolve. [561]

A summons issued by the Massachusetts Crime Commission to the custodian of records of the Massachusetts Turnpike Authority requiring his attendance before the commission to give evidence relating to "corrupt practices in government" and "in particular to . . . the operation of the . . . Authority," and requiring production of thirty-nine large books which were all but two of the books recording the minutes of meetings of the Authority since its inception some twelve years before, did not contravene established limitations on the summoning power in criminal cases made applicable by Res. 1962, c. 146, to summonses issued by the commission, and sufficiently showed on its face the relation between the books to be produced and the subject of the commission's inquiry. [561, 563]

Gardner *v.* Massachusetts Turnpike Authority.

The purposes for which a representative of the Massachusetts Turnpike
Authority was summoned by the Massachusetts Crime Commission un-
der Res. 1962, c. 146, to testify as to "the existence and extent of cor-
rupt practices in government at state and local levels in the Common-
wealth and in particular to . . . the operation of the . . . Authority"
were not so vague as to preclude the framing of any material and
proper questions at the hearing.    [563–564]

A representative of the Massachusetts Turnpike Authority summoned to
attend before the Massachusetts Crime Commission under Res. 1962,
c. 146, to testify as to "the operation of the . . . Authority" might
properly be required to answer, as relevant to the inquiry, questions
relating to the persons having "direct custody" of certain contracts and
various kinds of records of the Authority, the location of such contracts,
of records, and of minutes of meetings of the Authority, the destruction
of old records, the duties of the Secretary-Treasurer of the Authority,
the preparation of its budgets, certain personnel matters, and the one
in the Authority to whom a designated person reported; and, subject to
any claim of constitutional privilege by the witness, certain questions
relating to his prior employment.    [564–565]

PETITION filed in the Supreme Judicial Court for the
county of Suffolk on February 14, 1964.

The case was reserved and reported by *Whittemore, J.,*
without decision.

*Carl M. Sapers* (*Marvin R. Finn & Harold M. Willcox*
with him) for the petitioners.

*Edward O. Proctor* (*M. Vance Munro* with him) for the
respondents.

WHITTEMORE, J.   This petition for enforcement of proc-
ess and the respondents' counterclaim present questions
concerning the validity of five summonses addressed to cer-
tain officers and employees of the Massachusetts Turnpike
Authority and issued by the Commission appointed by the
Governor pursuant to Res. 1962, c. 146.   The petitioners
ask that an order issue that certain witnesses appear, that a
witness who has already appeared produce records, and that
certain questions already put to that witness be answered.

The cause was reserved by a single justice on the plead-
ings and the findings.

The one summons referred to in the petition was dated
February 10, 1964, and was addressed to "the Secretary or
other persons having custody of the records of the . . .
Authority."   It required attendance before the Commis-

sion "to give evidence of what you know relating to the existence and extent of corrupt practices in government at state and local levels in the Commonwealth and in particular to the following: the operation of the . . . Authority." It required the production of volumes 1 through 39 of the minutes of the meetings of the Authority.

An attorney for the Authority wrote the Commission on February 11, 1964, that the summons of February 10 was too broad and general. Stanley J. Britton, the person having custody of the minute books, appeared before the Commission on February 12 without the records and declined to answer certain questions. He appeared with express reservation of the Authority's objection as stated in the letter of February 11 and with an assertion of the inconvenience involved in bringing the thirty-nine minute books. Each book is about three inches thick. The books record the minutes of the Authority over the period from its inception in 1952 except that the two current minute books are not included. Britton testified that he referred to these older volumes very seldom and did not know how often others referred to them.

The four summonses put in issue by the counterclaim are addressed, respectively, to three employees and the secretary-treasurer of the Authority. They are in the form of the summons above described except for the statement of the particular inquiry. The summonses ordered attendance before the Commission on February 25, 1964, and informed the four prospective witnesses that their testimony would be sought as to the filing and storage of records in, and the operation of, the particular office for which each was responsible. None of these summonses asked the witness to bring records with him.

On February 25, 1964, an attorney for the Authority wrote the Commission that the persons summoned declined to appear because the summonses were too broad and general, failed to state any matter under examination with adequate specificity, and were issued in aid of unconstitutional practices and programs of the Commission. The motion

for leave to file the counterclaim challenging these summonses was filed on February 21, and allowed on February 25.

Other facts are stated below.

1. This court has jurisdiction of the proceeding in all its aspects. The fourth paragraph of Res. 1962, c. 146, authorizes the Commission to "require by summons the attendance and testimony under oath of witnesses and the production before it of books and papers relating to any matter being investigated by it pursuant to the provisions of this resolve." It authorizes any "justice of the supreme judicial court or of the superior court . . . [to] compel the attendance of witnesses summoned as aforesaid and the giving of testimony under oath before the commission in furtherance of any investigation under this resolve in the same manner and to the same extent as before the courts." This grant of enforcing power is to be read with the grant of power to the Commission to "require" the production of papers; so read, it authorizes enforcement of a summons to produce papers. *O'Shea* v. *Holyoke,* 345 Mass. 175, 179.

2. The respondents do not and rightly could not contend that the Commission lacks power to make any investigation of the doings of the Authority. Included in the mandate to the Commission is the investigation and study of "corrupt practices in government at state and local levels." The Authority was created by St. 1952, c. 354, and by § 3 of that act was "placed in the state department of public works [as] a body politic and corporate" and "constituted a public instrumentality . . . [the exercise of the powers of which were to be] deemed and held to be the performance of an essential governmental function." See *Massachusetts Turnpike Authy.* v. *Commonwealth, ante,* 524, 527–528.

3. The respondents contend that the Commission has embarked on an unconstitutional program that must be enjoined. It has become, in effect, they say, an agency for law enforcement and prosecution of crime rather than an investigatory arm of the Legislature and hence it violates the mandate of art. 30 of the Declaration of Rights requir-

ing separation of the executive, legislative, and judicial powers. The attack is based on a statement in the Third Report of the Commission dated December 2, 1963, and on the practices of the Commission and the attorney who is its counsel. The report states: "The Commission has a primary duty to report to the General Court any corrupt practices that its investigations may uncover and to recommend remedial legislation . . . . Its reports of corrupt practices and its recommendations for remedial legislation will not carry weight unless the existence and nature of corruption can be shown by naming the persons who have been guilty of corrupt practices and by describing the patterns of their corruption. This cannot be done until their guilt has been proven by their conviction."

The practice of the Commission is to "submit to the Department of the Attorney General such evidence . . . as in the opinion of the Commission warrants such submission." This is in personal discussions between general counsel for the Commission and representatives of the Attorney General, and by transmission of documents and transcripts. The findings of the single justice indicate that the policy of developing evidence to prove guilt will be applied to the summonses in suit, and that if "the . . . [result] of . . . [the] summonses . . . [is to] show that the . . . Authority has been engaged in corrupt transactions, that evidence will be turned over to the appropriate authorities."

The respondents assert that the Commission's preoccupation with law enforcement is also shown by the Attorney General's appointment of the attorney who is counsel for the Commission as a Special Assistant Attorney General and that attorney's participation, as a Special Assistant Attorney General, in the presentation to the grand jury of evidence obtained by the Commission.[1]

---

[1] "Certain of the evidence submitted to the Department of the Attorney General has been presented to grand juries and has resulted in indictments. Harold M. Willcox, General Counsel of the Commission, was appointed a Special Assistant Attorney General on May 9, 1963, to handle 'various criminal matters referred to [the Attorney General] by the Massachusetts Crime Commission.' Since that appointment Harold M. Willcox has participated in the presentation of evidence to grand juries on various occasions and has exam-

The sixth paragraph of Res. 1962, c. 146, expressly authorizes the Commission to submit evidence to the Attorney General or other law enforcement agency. This is a constitutional authorization. *Sheridan* v. *Gardner, ante,* 8, 15–18.

The practice of the Commission as to use of the evidence to convict wrongdoers does not take its program outside the resolve or violate art. 30. Putting aside the appearances of counsel before the grand jury, we think that the respondents show no more than a commission determined to be effective in its assigned legislative task of the discovery of corruption in government and, in connection therewith, rightly and lawfully dealing with evidence of corruption which that task brings to light.

The respondents urge, however, that the appearances of counsel for the Commission before the grand jury violate art. 30 and make all its work illegal. The respondents suggest that the appearances have been made under the resolve's grant of power to counsel for the Commission so to appear.[2] They contend that the appointment of the attorney who is counsel for the Commission as an Assistant Attorney General is, in reality, a sham to be disregarded by the court. See *Ayer* v. *Commissioner of Admn.* 340 Mass. 586, 598. It follows, the respondents contend, that the Commission is not performing a legislative function in a part of its work that it has declared to be of great importance, and this so affects its proceedings that the Authority and its agents may resist the summonses. We reject the argument. Even if the appearances of counsel before the grand jury should be deemed violations of art. 30, or other constitu-

ined some although not all of the witnesses. Either the Attorney General personally or the Assistant Attorney General in charge of the Criminal Division or both have been present during and have participated in the presentation of such evidence to such grand juries. Some of the evidence so presented consisted of testimony by Massachusetts Crime Commission investigators and the subject of their testimony related to matters discovered or observed in such capacity.''

[2] ''Upon order of the commission its counsel shall present to a grand jury for its action, or submit to the attorney general, a district attorney or other law enforcement agency, such evidence which has come to the attention of the commission as in the opinion of the commission warrants such presentation or submission.''

tional provision, as to which we intimate no opinion, this would not invalidate the investigation which the Commission is carrying forward by issuing these summonses. This investigation is a legislative function. See *Watkins* v. *United States,* 354 U. S. 178, 200, n. 33. Counsel for the Commission serves that function in appearing before the Commission and assisting in its investigations. The respondents have no standing in this case to protest on constitutional grounds the conduct of criminal proceedings initiated against others. See *Hynson, Westcott & Dunning, Inc.* v. *Commissioner of Pub. Health,* 346 Mass. 606, 610–611.

We need not determine whether the private rights of the respondent public officers or employees are so involved as to permit them to raise constitutional issues notwithstanding the rule stated in *Assessors of Haverhill* v. *New England Tel. & Tel. Co.* 332 Mass. 357, 362.

4. None of the five summonses is "too broad and general in scope." As the four later summonses call for no documents and specify the subject of the inquiry with greater particularity than the Britton summons, we discuss only the Britton summons.

(a) The respondents contend that the Britton summons is too broad since the power to issue summonses is, in the words of the respondents, limited to the investigation of "a specific transaction or transactions which would furnish the basis for a similar summons at the trial of a criminal case." This conclusion is compelled, the respondents argue, by the words of the resolve which authorize the Commission to issue summonses in connection with "any matter being investigated by it pursuant to the provisions of this resolve" and which provide that "all provisions of law relative to summonses issued in . . . [criminal] cases shall apply to summonses issued under this resolve so far as applicable." From this, the respondents conclude, the General Court intended the Commission to inquire into specific transactions just as trials in criminal cases examine specific charges. This construction is said to be reinforced by that portion

of the resolve which authorizes court enforcement of summonses so issued "in the same manner and to the same extent as before said courts."

This attempt to limit the scope of the Commission's express authority by the way in which the subordinate summoning power is specified in the resolve must fail. Contrary to the respondents' contention, the Legislature has expressly not confined the Commission to looking at specific transactions. Having itself very broad investigatory power (*Watkins* v. *United States,* 354 U. S. 178, 187), the Legislature has made a broad delegation of that power in these words: "to investigate and study . . . the existence and extent of organized crime within the commonwealth and corrupt practices in government at state and local levels, the existence of conditions which tend or may tend to prevent or interfere with the proper enforcement of the laws relating thereto, the existence of physical, legal and policy limitations on the powers and functions of those charged with the duty of enforcement of said laws and the extent to which the power of the government of the commonwealth . . . may or should be properly exercised at state and local levels."

The passages of the resolve which make applicable provisions of the criminal law relating to summonses and allowing court enforcement to the same extent as before the courts do not in form, expression, or position in the resolve, appear as limitations of this broad authority. They serve only to incorporate procedures to enforce compliance with summonses issued.

The investigations and studies of the Commission are to provide "a basis for legislative action" and to that end the Commission is required to make annual reports to the General Court. Plainly a commission so empowered is not limited in the use of its summoning power to an investigation of particular transactions. On the contrary it is in effect directed by the Legislature to make general inquiries, and the investigation of a general pattern is within the scope of the authorization.

The record shows that the Commission is investigating a general pattern in respect of the Authority.  By votes on January 9, 1963, and June 19, 1963, the Commission authorized hearings under the resolve with respect to the Authority.  Counsel for the Commission testified before the single justice over an objection subsequently waived that "the commission has had fourteen hearings relating to various transactions involving firms doing extensive business with the Massachusetts Turnpike Authority and on the basis of these hearings the Commission wishes not only further to examine the particular transactions . . . but also to review the record of all official transactions of the Authority for the purpose of determining whether the particular transactions are part of a general pattern."

We rule that the five challenged summonses were issued to secure information about a "matter being investigated" by the Commission "pursuant to the provisions" of the resolve within the meaning of the fourth paragraph of the resolve authorizing summonses and court enforcement.

(b) The Britton summons conforms to established limitations on the summoning power.

The provisions of the resolve making applicable "all provisions of law relative to summonses issued in" criminal cases, and granting authority to the courts to enforce attendance and the giving of testimony "in the same manner and to the same extent as before said courts" incorporate established limitations on the summoning power.  Thus the summons must describe with reasonable particularity the records to be produced and must not call for documents that are "plainly irrelevant" to an inquiry that is authorized by the resolve itself.  The demand must not call for so many documents concerned with doings in such a long period of time as to "exceed reasonable limits."  *Finance Commn. of Boston* v. *McGrath,* 343 Mass. 754, 761, 765.  The Britton summons does not exceed these limitations.  The record books are of course adequately identified.  The breadth of the Commission's right of inquiry into the doings of the Authority makes possibly relevant the minutes of the Authority's meetings.

It does not appear that the functioning of the Authority will be seriously interfered with by the examination of its thirty-nine record books. Significant in this connection is the provision of the resolve that "the commission may require the co-operation of all agencies of state and local governments."

There can be no doubt that the authority is an agency of State government within the intent of the resolve. Point 2, *supra*. *Massachusetts Turnpike Authy.* v. *Commonwealth, ante,* 524, 527–528. Although the coöperation of the Authority may not be enforced in the courts (*Gardner* v. *Callahan, ante,* 21), the direction that coöperation be given declares a legislative policy that these agencies reasonably adjust their own doings so as to facilitate, and in any event not to obstruct, the Commission's work.

Since the summonses do not contravene established limitations on the summoning power, there is no need to inquire to what extent such limitations are required by the Fourteenth Amendment of the United States Constitution or art. 14 of the Declaration of Rights or whether the Authority or the other respondents have standing to raise these constitutional issues. See *Assessors of Haverhill* v. *New England Tel. & Tel. Co.* 332 Mass. 357, 362.

The Authority relies on cases such as *Federal Trade Commn.* v. *American Tobacco Co.* 264 U. S. 298, and *Jones* v. *Securities & Exch. Commn.* 298 U. S. 1. There are differences between such cases and that now before us in respect of the scope of the underlying authorization, the purpose of the inquiry, and the nature of the party being investigated. But in any event the rules as to the permissible breadth of summonses issued by administrative bodies have been extended in more recent cases. See *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186; *Endicott Johnson Corp.* v. *Perkins,* 317 U. S. 501; *Civil Aeronautics Bd.* v. *Hermann,* 353 U. S. 322, reversing per curiam 237 F. 2d 359 (9th Cir.); Note, 69 Yale L. J. 131, 131–134.

The restriction imposed in some cases on grand jury proceedings to the effect that the district attorney must be able

if challenged to show that all the matters requested are relevant to the inquiry (see, for example, *Matter of Moore* v. *Delaney,* 180 Misc. (N. Y.) 844, 848 [Supr. Ct.]) is not the general rule. *Blair* v. *United States,* 250 U. S. 273, 282–283. *People* v. *Allen,* 410 Ill. 508, 517–518 ("The very purpose of such an inquiry is to uncover matters previously unknown to the investigating agency"), cert. den. sub nom. *Allen* v. *Illinois,* 344 U. S. 815. Note, 74 Harv. L. Rev. 590, 592–593. In any event the restriction would be inapplicable where there is such a broad delegation of the extensive legislative power as is made by Res. 1962, c. 146. See 74 Harv. L. Rev. 590, 599.

(c) The summons is not invalid for failure to show on its face the relation between the documents sought and the subject of the inquiry.

The practice in criminal cases in this Commonwealth is to identify in the summons the pending cause or proceeding. See G. L. c. 233, § 1.[3] The Britton summons adequately specifies an inquiry under the resolve into "the operation of the . . . Authority."

5. Britton, relying on *Watkins* v. *United States,* 354 U. S. 178, contends that he should not be required to answer twenty of the questions propounded to him because he has not "been adequately informed as to the scope of the inquiry."

In the *Watkins* case it was held that, where a witness testifying before a committee of Congress was tried under 2 U. S. C. § 192 (1958) for a refusal to answer "any question pertinent to the question under inquiry," due process barred conviction where the mandate of the committee was so vague that the witness was not on fair notice that his refusal to answer a given question would be criminal. However, the court in the *Watkins* case noted that "[t]here are several sources that can outline the 'question under in-

---

[3] The summonses to appear before the grand jury, as well as those to appear in the trial of a criminal case, specify only that witnesses are to appear on a stated date and at a stated place "then and there to give evidence of what they know in the case of the Commonwealth against          ."

quiry' in such a way that the rules against vagueness are satisfied. The authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves, might sometimes make the topic clear." 354 U. S. at 209.

The summons informed Britton that he was to be examined about "the existence and extent of corrupt practices in government at state and local levels in the Commonwealth and in particular to the following: the operation of the Massachusetts Turnpike Authority." It is established that the purposes for which Britton was called to testify "are not so vague and uncertain as to permit us to rule that no proper questions material to the subject by any possibility could be framed at a hearing." *Sheridan* v. *Gardner, ante,* 8, 20. As the present case involves particular questions asked at a hearing, the issue before us is whether, consistently with due process, we can command Britton to answer on pain of contempt. Where, as here, the failure to answer a relevant question is neither a crime nor, in the absence of a court order, a contempt, the court must interpose its order as to the relevancy of the question and must make clear the witness's obligation. This being done, and reflected in an order of the court, there is no basis for contending that the witness's obligation is not clear.

We rule that the questions asked are relevant.[4] Those

---

[4] Eighteen of the unanswered questions follow:

[1] "Please identify the room in the office of the Authority at which the minutes of the meetings are located, either giving the room number or the person whose office this is normally considered to be.

[2] "Who in the Turnpike organization has direct custody of the contracts for engineering services in connection with the extension from Weston to Boston of the Massachusetts Turnpike Authority?

[3] "Where are such contracts kept?

[4] "Who in the Turnpike Authority organization has direct custody of contracts or other agreements between the Authority and the Perini Corporation relating to the extension of the turnpike from Weston to Boston?

[5] "Where are such contracts or agreements located?

[6] "Is there any adopted procedure at the Turnpike Authority for the regular retirement of records? That is, the destruction of records after a period of time?

that relate only to the Authority are to be answered. No point is made for Britton that the two questions as to his prior employment[5] raise any claim of constitutional privilege. Subject thereto, they are to be answered. *Burnham* v. *Morrissey,* 14 Gray, 226, 240–241. *Emery's Case,* 107 Mass. 172, 182–184. *Sheridan* v. *Gardner, ante,* 8, 20.

6. The rescript to the county court shall direct that an order issue requiring the attendance of the five witnesses before the Commission for the purposes stated in the respective summonses and that the respondent Britton bring

[7] "Please give the location of the various places under the jurisdiction of the Massachusetts Turnpike Authority where the principal categories of Turnpike records are stored, breaking down your answer between current records and old records and further breaking down your answer as to categories of records to the extent that you are able to do so.

[8] "Do you store any of your official records outside of your premises at 80 Boylston Street?

[9] "Please tell us who in the Turnpike organization has direct custody of records relating to land takings by the Turnpike Authority in connection with the extension from Weston to Boston.

[10] "As to the records referred to in my last question, I wonder if you could tell us where they are presently located?

[11] "Please tell us who in the Turnpike organization has direct custody over the payroll records for 1963 of all employees of the Massachusetts Turnpike Authority.

[12] "Please tell us where such records are located.

[13] "Does the office of Secretary-Treasurer have anything to do with the preparation of budgets either annual budgets for the Authority or otherwise?

[14] "Who within the Turnpike organization has direct custody of records relating to the hiring of outside professional services, included in which are the services of lawyers, accountants and public relation specialists?

[15] "Where are the records relating to the hiring or retaining of outside independent lawyers, accountants and public relation specialists located physically in the Turnpike Authority?

[16] "Does the Secretary-Treasurer's office have any responsibility for the hiring and firing of personnel?

[17] "Is there one person in the Turnpike Authority organization who has the title Director of Personnel or a similar title with the same intent?

[18] "To whom in the Massachusetts Turnpike Authority does Mr. Schneckenberg report?"

5 [19] "Prior to your employment with the Massachusetts Turnpike Authority, were you employed with any organization or agency which was related to the Turnpike Authority or was a contracting party with the Turnpike Authority?

[20] "Had you at any time prior to this most recent six month period been employed by the Turnpike Authority?"

records and answer questions, all in accordance with this opinion. We assume that the Authority, or its agents, representatives, or employees will respond to further summonses and questions in conformity with the principles herein stated. Nevertheless, questions may arise as to the application of these principles in particular cases. The county court in its order will therefore retain jurisdiction with leave to the parties, or any agents, representatives, or employees of the Authority who may become parties by intervention, to apply upon motion and short notice for additional relief as occasion may arise. *Finance Commn.* v. *McGrath,* 343 Mass. 754, 768.

*So ordered.*